UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 21-60340-CR-HUCK/BECERRA(s)

UNITED STATES OF AMERICA,

v.

ARTURO CARLOS MURILLO PRIJIC,

Defendant.
_____/

### FACTUAL PROFFER

The United States of America (the "United States") and Arturo Carlos Murillo Prijic (the "defendant"), stipulate and agree that the information stated herein is true and accurate and a sufficient basis for the defendant's plea of guilty to the money laundering conspiracy in violation of Title 18, United States Code, Section 1956(h), charged in the instant case and the forfeiture of the assets identified in the Superseding Information. Had this matter proceeded to trial, the defendant stipulates and agrees that the government would have proven the facts alleged below beyond a reasonable doubt and the forfeiture allegations set forth in the Superseding Information by a preponderance of the evidence.

1.  Between in or around 2019 and 2020, the Ministerio de Gobierno de Estado Plurinacional de Bolivia (the "Bolivian Ministry of Government") was the Bolivian ministry responsible for public safety in Bolivia. The Bolivian Ministry of Government was a "department" of the Bolivian government as that term is used in the Foreign Corrupt Practices Act ("FCPA"), Title 15, United States Code, Section 78dd-2(h)(2)(A). During the relevant time period, the defendant was the Bolivian Minister of Government and Sergio Rodrigo Mendez Mendizabal ("Mendez") served as the Chief of Staff of the Bolivian Ministry of Government.

The defendant and Mendez were each a "foreign official" as that term is defined in the FCPA, Title 15, United States Code, Section 78dd-2(h)(2)(A).

2. Between in or around 2019 and 2020, the Ministerio de Defensa de Estado Plurinacional de Bolivia (the "Bolivian Ministry of Defense") was responsible for the defense of Bolivia and its armed forces. The Bolivian Ministry of Defense was a "department" of the Bolivian government as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(2)(A).

3. "Intermediary Company" was a Florida company that sold tactical equipment, including to the Bolivian Ministry of Defense. During the relevant time period, Intermediary Company operated out of Tamarac, Florida, in Broward County, in the Southern District of Florida. Intermediary Company was a "domestic concern" as that term is defined in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1). Intermediary Company maintained a U.S.-based bank account at U.S. Bank 1 and ending in 0506 (the "0506 Account").[1]

4. Bryan Samuel Berkman ("Bryan Berkman") was a United States citizen who owned Intermediary Company and resided in the Southern District of Florida. Bryan Berkman was a "domestic concern," an officer, director, employee, and agent of a "domestic concern," and a stockholder acting on behalf of a "domestic concern," as those terms are used in the FCPA, Title 15, United States Code, Section 78dd-2(a).

5. Luis Berkman was a United States citizen who worked closely with Intermediary Company and resided in Georgia. Luis Berkman was a "domestic concern" and an agent of a

---

[1] U.S. Bank 1 was headquartered in New York, New York, and insured by the Federal Deposit Insurance Corporation ("FDIC").

"domestic concern" as those terms are used in the FCPA, Title 15, United States Code, Section 78dd-2(a).

6. Philip Lichtenfeld ("Lichtenfeld") was a United States citizen and associate of the defendant and Mendez. Lichtenfeld was a "domestic concern" and an agent of a "domestic concern" as those terms are used in the FCPA, Title 15, United States Code, Section 78dd-2(a).

7. Individual 1 was a citizen of Bolivia and an associate of Lichtenfeld. Individual 1 maintained a bank account in Miami, Florida, at U.S. Bank 1 and ending in 6222 (the "6222 Account").

## OVERVIEW

8. Between in or around October 2019 and in or around January 2021, Mendez, Luis Berkman, Bryan Berkman, Lichtenfeld, and others, knowingly and willfully conspired to use, and did use, the mails and means and instrumentalities of interstate commerce, including Intermediary Company, U.S. bank accounts, and U.S.-based email and text message communications, to corruptly offer, promise to pay, authorize the payment of, and pay, at least approximately $700,000 in bribes to Bolivian government officials, including, but not limited to the defendant and Mendez, in order to influence those officials in their official capacities and to secure an improper advantage to assist Intermediary Company, Luis Berkman, Bryan Berkman, and others in obtaining an approximately $5.6 million contract to supply tear gas to the Bolivian Ministry of Defense (the "Illegal Bribery Scheme"). In connection with the Illegal Bribery Scheme, the defendant personally received at least approximately $532,000. The defendant knew that this conduct was unlawful.

9. Further, between in or around October 2019 and in or around January 2021, the defendant and others, including, but not limited to, Mendez, Luis Berkman, Bryan Berkman, and

Lichtenfeld, knowingly and voluntarily conspired to knowingly engage in monetary transactions by, through, or to a financial institution, affecting interstate commerce in criminally derived property of a value greater than $10,000 that was derived from the Illegal Bribery Scheme. The defendant knew that this conduct was unlawful.

10. Specifically, the defendant and his co-conspirators agreed to execute, and in fact executed, the following monetary transactions:

- In or around March 2020 and April 2020, the defendant and his co-conspirators caused approximately $649,975 in wire transfers to be paid from bank accounts located in the Southern District of Florida and in Singapore, traceable to the criminal proceeds of the Illegal Bribery Scheme, to U.S.-based bank accounts controlled by Luis Berkman;

- On or about April 14, 2020, and April 15, 2020, the defendant and his co-conspirators caused approximately $700,000 in wire transfers from Intermediary Company's 0506 Account to Individual 1's 6222 Account, in order to fund U.S. currency bribe payments to the defendant and Mendez; and

- On or about April 14, 2020, the defendant and his co-conspirators caused Intermediary Company to transfer approximately $500,000 from the 0506 Account to a bank account in Bolivia for the benefit of Lichtenfeld, which represented his "fee" for participating in the Illegal Bribery Scheme.

- On or about June 5, 2020, the defendant and his co-conspirators caused the delivery and transfer of approximately $140,000 in U.S. currency in a cardboard box to Bryan Berkman in Tamarac, Florida, in the Southern District of Florida.

Ultimately, approximately $130,000 of the proceeds were delivered to the defendant's relative's home in Doral, Florida, for the defendant's benefit. As the defendant and his co-conspirators planned, each of these transactions involved criminally derived proceeds of the Illegal Bribery Scheme of a value greater than $10,000.

## THE BRIBERY AND MONEY LAUNDERING SCHEME

11. On or about December 19, 2019, Intermediary Company executed an approximately $5,649,137 contract with the Bolivian Ministry of Defense to supply tear gas and other non-lethal equipment (the "Tear Gas Contract"). In exchange for the Tear Gas Contract, the defendant agreed with Mendez, Luis Berkman, and Bryan Berkman that Luis Berkman and Bryan Berkman would pay bribes to the defendant, Mendez, and other Bolivian government officials using proceeds of the Tear Gas Contract.

12. In or around January 2020, Lichtenfeld agreed to engage in the Illegal Bribery Scheme in exchange for $500,000.

13. Between on or about March 17, 2020, and on or about April 8, 2020, the defendant, Mendez, Luis Berkman, Bryan Berkman, Lichtenfeld and others caused the Central Bank of Bolivia to wire transfer approximately $5,731,486 from a bank account in Bolivia to Intermediary Company's 0506 Account, as payment under the Tear Gas Contract.

14. On or about March 18, 2020, Intermediary Company wire transferred approximately $3,357,735 of the proceeds of the Tear Gas Contract from the 0506 Account to a bank account in Brazil to pay the manufacturer of the tear gas and non-lethal equipment that Intermediary Company supplied to Bolivia under the Tear Gas Contract.

15. On or about April 14, 2020, and April 15, 2020, Luis Berkman, Bryan Berkman, and Lichtenfeld used a portion of the remaining proceeds of the Tear Gas Contract to wire transfer

approximately $700,000 from Intermediary Company's 0506 Account to Individual 1's 6222 Account. These transfers were made in order for the defendant and Mendez to receive, in Bolivia, hundreds of thousands of dollars in U.S. currency bribe payments in exchange for having assisted Intermediary Company with obtaining the Tear Gas Contract. The defendant and his co-conspirators intentionally engaged in these transactions to make it difficult to trace the source of these funds.

16. On or about April 14, 2020, the defendant and his co-conspirators caused Intermediary Company to transfer approximately $500,000 of the Tear Gas Contract proceeds from the 0506 Account to a bank account in Bolivia for the benefit of Lichtenfeld, which represented his "fee" for participating in the Illegal Bribery Scheme.

17. On or about April 15, 2020, Mendez went to the house of a relative of Lichtenfeld in Bolivia and picked up a bribe payment in U.S. currency traceable to the Illegal Bribery Scheme. Mendez left approximately $100,000 of the bribe payment at Lichtenfeld's relative's house, which Lichtenfeld invested in a real estate project in Bolivia on behalf of the Mendez. Mendez departed the house with approximately $582,000 in U.S. currency. After leaving the house of the relative of Lichtenfeld, Mendez kept at least approximately $180,000 of the bribe payment and delivered the remainder of the bribe payment, approximately $402,000 in U.S. currency, to the defendant.

18. The defendant and his co-conspirators also assisted in transferring approximately $649,975 in corrupt proceeds from the Tear Gas Contract to Luis Berkman. Specifically:

- On or about March 27, 2020, Bryan Berkman wire transferred approximately $50,000 from Intermediary Company's 0506 Account to Luis Berkman's bank account at U.S. Bank 2 ending in 8046;[2]

- On or about April 14, 2020, Bryan Berkman wire transferred approximately $300,000 from Intermediary Company's 0506 Account to the Singapore bank account of a Singapore-based shell company (the "Singapore Bank Account");

- On or about April 17, 2020, approximately $300,000 was wire transferred from the Singapore Bank Account to Luis Berkman's account at U.S. Bank 2 ending in 8046;

- On or about April 23, 2020, Lichtenfeld wire transferred approximately $145,000 from a bank account at U.S. Bank 3 ending in 6693 to Luis Berkman's account at U.S. Bank 4 ending in 3015;[3] and

- On or about April 24, 2020, approximately $154,975 was wire transferred from the Singapore Bank Account to Luis Berkman's account at U.S. Bank 4 ending in 3015.

19. The defendant communicated with his co-conspirators via phone, WhatsApp, and in-person. For example, on April 20, 2020, after Mendez had dropped off the $402,000 cash bribe to the defendant in Bolivia, the defendant sent a WhatsApp message to Luis Berkman, "They gave me documents all ok friend" (translated from Spanish). Here, "documents" refers to the cash bribe.

20. In or about January 2020 and June 2020, Luis Berkman, Bryan Berkman, and Lichtenfeld generated, in the Southern District of Florida, approximately $360,000 in U.S.

---

[2] U.S. Bank 2 was headquartered in San Francisco, California, and insured by the FDIC.

[3] U.S. Bank 3 was headquartered in New York, New York. U.S. Bank 4 was headquartered in Charlotte, North Carolina. Both were insured by the FDIC.

currency to pay bribes in connection with the Tear Gas Contract. As described below, Luis Berkman ultimately delivered approximately $130,000 of this cash to the defendant's family member's home in Doral, Florida as a bribe for the defendant's benefit.

21. On or about January 16, 2020, Bryan Berkman picked up a small suitcase containing $80,000 in cash in downtown Miami. Lichtenfeld arranged to have the funds available for pick-up through an Argentina-based associate.

22. Bryan Berkman brought the $80,000 in cash to his home in Tamarac, Florida. Thereafter, Luis Berkman picked up the $80,000 in cash and delivered it to the defendant's relative's house in Doral, Florida, as a bribe for the defendant's benefit.

23. In or about June 2020, Lichtenfeld and Luis Berkman arranged for an additional $280,000 in cash to be delivered to Bryan Berkman's residence in Tamarac, Florida. Soon thereafter, Luis Berkman picked up the $280,000 in cash from Bryan Berkman and delivered approximately $50,000 to the defendant's relative's house in Doral, Florida, as a bribe for the defendant's benefit. Luis Berkman kept the remaining cash to pay a bribe to a high-ranking Bolivian government official.

24. The preceding statement is a summary, made for the purpose of providing the Court with a factual basis for the defendant's guilty plea to the charge against him. It does not include all the facts known to the defendant or the United States concerning criminal activity in which the defendant and others engaged. The defendant makes this statement knowingly and voluntarily and because he is in fact guilty of the crime charged.

JUAN ANTONIO GONZALEZ
UNITED STATES ATTORNEY

Date: 10/17/22

ELI S. RUBIN
ASSISTANT U.S. ATTORNEY

GLENN S. LEON
CHIEF, FRAUD SECTION
CRIMINAL DIVISION
U.S. DEPARTMENT OF JUSTICE

Date: 10/17/22

JIL SIMON
TRIAL ATTORNEY
GERALD M. MOODY, JR.
ASSISTANT CHIEF

Date: 9-19-22

ANA M. DAVIDE
ATTORNEY FOR DEFENDANT

Date: 9-19-22

ARTURO CARLOS MURILLO PRIJIC
DEFENDANT

9